IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> ANAUDI HERNÁNDEZ-PÉREZ, <u>ET AL.</u> <br><br> Defendants. | CRIMINAL NO. 15-739 (PAD) |

**OPINION AND ORDER**

Delgado-Hernández, District Judge.

Before the court is Javier Muñiz-Álvarez' "Motion to Dismiss the Indictment as to Defendant Javier Muñiz-Álvarez or, alternatively, for Severance of the Appearing Defendant from his Co-defendants and Scheduling of Prompt Trial Date" (Docket No. 166), which the government opposed (Docket No. 188). Muñiz replied (Docket No. 194). Codefendants Sally López-Martínez, Glenn O. Rivera-Pizarro, Sonia M. Barreto-Colón, and Marielis Falcón-Nieves joined Muñiz' motion (Docket Nos. 186, 187, 212, and 234). For the reasons below, the motions are DENIED.

**I.   BACKGROUND**

On December 2, 2015, Muñiz, along with nine other codefendants, was charged with conspiring to engage in bribery, fraud, money laundering, and with attempt to obstruct, influence and impede an official investigation by destroying records (Docket No. 3). On February 5, 2016, he filed the motion *sub judice*. He alleges that because he is only charged with taking part in one of three schemes described in the Indictment (the "ADL" scheme), he should be severed from the other codefendants who are charged with participating in the two remaining schemes (the "AAA" scheme and the "PRHR" scheme) (Docket No. 166 at pp. 1-2). Additionally, he contends that he should be severed from the codefendants charged with participating within the ADL scheme (i.e.

Anaudi Hernández-Pérez, and Sally López-Martínez) for, in his view, failure to do so would result in severe and undue prejudice to his right to a fair trial. Id. at p. 2. Finally, he requests that a jury trial be held as soon as practicable because otherwise, there would be a violation of his Sixth Amendment right to a speedy trial. Id. at pp. 2-3.

The government counters that joinder of the charged offenses is proper because the charges against Muñiz are part of the same series of acts or transactions constituting a large scale conspiracy to defraud the government (Docket No. 188 at pp. 1-3). It claims Muñiz has not made a strong showing of prejudice warranting severance. Id. at p. 9. As a final point, it requests the court to issue an affirmative ruling pertaining to Muñiz' trial clock under the Speedy Trial Act. Id. at pp. 17-22.

## II.     DISCUSSION

### A. Joinder

Rule 8 of the Federal Rules of Criminal Procedure governs both joinder of offenses and joinder of defendants in criminal cases. Rule 8(a) permits joinder of two or more criminal offenses if the offenses are "of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed.R.Crim.P. 8(a). Rule 8(b) provides that an "indictment or information may charge two or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." A conspiracy count may be a sufficient connecting link between the codefendants and the offenses charged. United States v. Arruda, 715 F.2d 671, 678 (1st Cir. 1983).

1. Muñiz

Muñiz argues that he is charged in only three counts out of the twenty-two included in the Indictment, involving one of three schemes, that the three schemes run independently from each other, that there is no overall conspiracy or common illegal plan involving all defendants, and that there is no glue to link him to anything but to Counts 1, 18 and 23 of the Indictment (Docket No. 166 at pp. 4-15). He asserts that the Indictment against him should be dismissed or, in the alternative, the counts involving the scheme in which he is charged along with codefendants Anaudi Hernández and Sally López should be severed from the counts involving the other two schemes and all of the other codefendants. Id. at p. 4.

Muñiz is charged in Count 1 (Conspiracy to Commit Federal Programs Fraud and Wire Fraud), Count 18 (Conspiracy to Commit Money Laundering), and Count 23 (Destruction of Records). In the conspiracy to commit Federal programs fraud and wire fraud count, the Indictment alleges that Muñiz conspired, combined, and agreed with codefendants Anaudi Hernández, Sally López, Sonia Barreto, Ivonne Falcón and others known and unknown to the Grand Jury to devise and intend to devise a scheme and artifice to defraud and deprive the United States and citizens of Puerto Rico of honest services from public officials López, Barreto, and Falcón.

According to the Indictment, López was an agent of the Workforce Development Administration of Puerto Rico ("ADL," by its Spanish acronym), and Barreto and Falcón were both agents of the Aqueducts and Sewers Authority of Puerto Rico ("AAA," by its Spanish acronym). Both entities had received federal financial assistance in excess of $10,000 in a one-year period. It is alleged that Muñiz conspired with codefendants and others to corruptly give, offer, and agree to give anything of value to public officials, with the intent of influencing and

rewarding them, in connection with any business, transaction, and series of transactions of ADL and AAA, involving anything of value of at least $5,000, including recommendations for appointments and employment, dinners, gifts, entertainment and other things of value by and from codefendant Hernández, in exchange for obtaining favorable treatment and the awarding of government contracts to companies *de facto* controlled by Hernández, and other official acts (Docket No. 3 at ¶¶ 11-15)(Count 1).

As to the Puerto Rico House of Representatives ("PRHR"), the Indictment charges that Anaudi Hernández, Xavier González, Víctor Burgos, Glenn Rivera and others known and unknown to the Grand Jury conspired and agreed to devise a scheme and artifice to defraud and obtain money and properties by means of false and fraudulent pretenses, and promises, and in doing so, transmitting and causing to be transmitted by means of wire communications in interstate or foreign commerce, writings, signals, and email communications for the purpose of executing such scheme and artifice to defraud, in violation of 18 U.S.C. § 1343.

The Indictment asserts that beginning in or about late 2012, and continuing in or about early 2013, Hernández and his co-conspirators formalized plans to obtain government contract with numerous governmental entities, including but not limited to ADL, AAA, and the PRHR (Docket No. 3 at ¶ 23). To discuss the plan, Hernández, Muñiz and co-conspirators held meetings to examine possible government contract and proposal opportunities. Id. at ¶ 24. To that effect, available proposals, agencies to find proposals, and companies that could be created to obtain government contracts were discussed. Id.

Finally, the Indictment states that Muñiz conspired and combined with codefendant Hernández and others to conduct and attempt to conduct financial transactions affecting interstate commerce, which transactions involved the proceeds of specified unlawful activity, that is,

proceeds of violations of 18 U.S.C. § 666 (bribery involving a program receiving federal funds), 18 U.S.C. §§ 1343 and 1349 (wire fraud and conspiracy to commit wire fraud), knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) (Docket No. 3, Count 18). The purpose of the conspiracy of which Muñiz has been alleged to be a part, was for the defendants to utilize the public officials in positions within the government of Puerto Rico to benefit and enrich themselves through bribery. Id. at ¶ 16.

If the allegations are to be believed, the acts charged are part of an over-arching conspiracy, under which Muñiz collaborated to appropriate government funds illegally through bribes and misappropriation of government funds in various government agencies, with money laundering and wire fraud, for purposes of self-enrichment. He was sufficiently connected to the master scheme. As such, the events described involve "two or more acts or transactions connected together or constituting parts of a common scheme or plan." Fed. R. Crim. P. 8(a). Their relatedness evidences "[a] rational basis in fact, sufficient to warrant joinder" under Rule 8(b). United States v. Houle, 237 F.3d 71, 75 (1st Cir. 2001). Consequently, this relatedness justifies joinder as to Muñiz in connection with ADL, AAA, and the PRHR under Rule 8 of the Federal Rules of Criminal Procedure.

  2. López, Rivera, Barreto, and Falcón

López, Barreto, Falcón and Rivera joined Muñiz' motion, without providing individualized argumentation as to how Muñiz' arguments fit their particular posture. Nonetheless, the court will

extrapolate the arguments from Muñiz' motion as to them. The Indictment links López to ADL, Barreto and Falcón to AAA, and Rivera to the PRHR. To that extent, the court assumes they complain about improper joinder based on the existence of three conspiracies rather than one conspiracy.

The characterization of activities as a single or multiple conspiracies is not new. In Kotteakos v. United States, 328 U.S. 750 (1946), the indictment charged thirty-two individuals with conspiracy to obtain loans under a Fair Housing Act program by making false applications. Simon Brown was the sole connection between each of the other defendants, helping those individuals obtain the loans. Id. at 754. The Supreme Court held that such evidence made out a case not for a single conspiracy but for "at least eight and perhaps more, separate and independent groups [of co-conspirators], none of which had any connection with any other, though all dealt independently with Brown as their agent." Id. at 754-755. It analogized the scheme to a rimless wheel, in which Brown was the hub and the other co-conspirators were unrelated spokes. Thus, it concluded that there was a prejudicial variance between the charge and the evidence, and reversed the convictions. Id. at 755.

In Blumenthal v. United States, 332 U.S. 539 (1947), defendants Goldsmith, Weiss, Feigenbaum, Blumenthal, and Abel were convicted of conspiring to dispose of two carloads, each consisting of about 2,000 cases of whiskey, at prices above the ceiling set by regulations of the Office of Price Administration. The Supreme Court found a single conspiracy. The whiskey was shipped by rail from the distiller to the Francisco Distributing Company, which Goldsmith owned. Weiss was sales manager for the business. Feigenbaum operated the Sunset Drugstore in San Francisco. Blumenthal owned and operated a sporting goods and pawn shop in the same city. Abel either owned or worked in a jewelry store in Vallejo, California. The evidence did not show that

any of these last three individuals was connected with Francisco in any way except that each had a part in arranging sales and deliveries of portions of these two shipments to purchasers, tavern owners in San Francisco and near-by towns.

The Supreme Court distinguished those facts from Kotteakos, noting that apart from the much larger number of agreements there involved, no two of those agreements were tied together as stages in the formation of a larger all-inclusive combination, all directed to achieving a single unlawful end or result.  On the contrary, each separate agreement had its own distinct, illegal end. Each loan was an end in itself, separate from all others, although all were alike in having similar illegal objects.  Except for Brown, no conspirator was interested in whether any loan except his own went through.

For the Court, there was no drawing of all together in a single, over-all, comprehensive plan.  Id. at 558.  But it went on to explain that in Blumenthal, all of the defendants intended to sell the whiskey unlawfully, and all had knowledge of the plan's general scope to aid in disposing of the whiskey.  And while each salesman aided in selling only his part, he knew the lot to be sold was larger and thus that he was aiding in a larger plan.  For the Court, the several agreements were essential and integral steps in achieving the main objective.  Id. at 559.  The contrast between Kotteakos and Blumenthal serves as a guidepost for determining whether a valid joinder exists here.

Kotteakos puts forward the "hub-and-spokes" conspiracy model, whereas Blumenthal is consistent with a typical chain conspiracy.  The "hub-and-spokes" model is akin to a circle, involving a number of persons (the spokes) engaged in similar relationships with the same individual at the center (the hub). Assuming that a criminal conspiracy exists between each spoke and the hub, the problem is whether the spokes can be drawn together into a single all-inclusive

conspiracy. The chain conspiracy is characterized by different activities successively carried on with regard to the same subject. In the end, the government may not charge "multiple unrelated conspiracies," but can charge a "master conspiracy [with] more than one subsidiary scheme." United States v. Kenny, 462 F.2d 1205, 1216 (3d Cir. 1972) (so recognizing).

In Kenny, appellants were convicted of participating in a large-scale scheme that required contractors to pay kickbacks to government officials in order to procure government contracts. Each of them acting in concert with one or more of the others used his position as a current or former highly placed public official or political leader, to fasten upon the city and county administrations a system whereby no one could do business without kicking back a percentage, usually 10% of the contract price. This was achieved in three ways. First, the competitive bidding process was perverted by a pre-qualifying arrangement which enabled the defendants to exclude from bidding contractors unwilling to kick back. Second, payments for work already done would be withheld until the kickback was made. Third, on contracts not subject to competitive bidding the contract would not be awarded to anyone unwilling to kick back.

At the head of this system was the defendant Kenny, the *de facto* boss of the political party in power. He determined who would hold public office in the city and county governments and organized a system to insure that all contractors working on a public project would kickback a percentage of the contract price to a designated bagman. Members of the city government would collect kickbacks from city contractors and members of the county government would collect from county contractors.

In United States v. Greenidge, 495 F.3d 85 (3d Cir. 2007), appellants were found guilty of conspiracy to commit bank fraud, and of conspiracy to engage in monetary transactions involving the proceeds of criminally derived property. One appellant was also convicted of aiding and

abetting the crime of bank fraud. They all claimed the Indictment alleged a single conspiracy for each count whereas in their view, the evidence demonstrated separate conspiracies, a conspiracy per appellant per count. The Court rejected the claim, describing the conspiracy as one essentially involving three tiers. At the top was one Rankin, who along with other co-conspirators, obtained stolen checks from mail rooms and post offices and arranged for those checks to be altered and deposited into various accounts and for the proceeds to be withdrawn. Rankin handed the checks off to Samuel Massaquoi, who served as a liaison between Rankin and the co-conspirator who altered the payee names on the checks for a fee. Finally, there were recruiters who solicited depositors, that is, people willing to use their personal or business bank accounts to deposit the stolen and altered checks in order to make them appear legitimate.

For the Court, there was a common goal among the conspirators: to make money by depositing stolen and altered corporate checks into business accounts. The activities of two of the appellants as depositors and of providing the individual at the top of the conspiracy with account numbers and deposit slips, were deemed necessary to the overall success of the venture. And there was a degree of participant overlap in the plan. The checks that two of the appellants deposited came from the same source (Rankin), and were altered by the same person (Deji) for the same reason (to pass the scrutiny of the banks). Rankin and Deji worked with a network of recruiters to find depositors.

The scheme needed a constant supply of willing depositors or the operation would necessarily have ceased. Even though appellants contended that the case reflected the "wheel-hub-spoke" conspiracy described in Kotteakos, id. at 94, the Court said it more accurately depicted a pyramidal corporate structure with Rankin and Deji, the check alterer and their liaison at the top,

the recruiters at the middle, and depositors such as Pallitta and Greenidge at the base. Id. at 94-95.

The facts alleged in the present case fit these configurations. At the top of the pyramid was Hernández, who, acting in concert with others, targeted ADL, AAA, and the PRHR. There was a common goal: to provide various things of value to public officials in exchange for obtaining favorable treatment in the award of government contracts and other official acts, and to benefit and enrich themselves through bribery. The overall success of the venture called for a constant supply of government-contract money. Here, López, Falcón, and Rivera served as the pyramid base much like Pallitta and Greenidge in Greenidge, 495 F.3d at 85, or as the government intermediaries in Kenny, 462 F.2d at 1205.

In like manner, the configuration resembles those the First Circuit described in United States v. Arruda, 715 F.2d 671 (1st Cir. 1983), and United States v. Celestin, 612 F.3d 14 (1st Cir. 2010). In Arruda, appellants were found guilty of one count of conspiracy and one count of violating the Travel Act. The convictions stemmed from their involvement in a scheme to obtain kickbacks from renovation work performed by the Fall River Housing Authority ("FRHA"). Appellants claimed the government improperly joined defendants and offenses because there was not a single conspiracy but multiple conspiracies with some common actors.

The First Circuit rejected the claim, noting that joinder was appropriate because Count 1 of the Indictment alleged a conspiracy in which all of the appellants were named as coconspirators; all of them were aware of the general aim of the conspiracy (obtaining kickbacks through the award of FRHA contracts for work on FRHA projects); and they each participated in acts to further the ends of the conspiracy. That they did not each participate in every transaction necessary to fulfill the aim of their agreement did not transform the sequence of events into multiple conspiracies.

The evidence showed a complex scheme pervading many levels of different companies and government organizations. Arruda, 715 F.2d at 678-679.

In Celestin, the appellant was found guilty of bank fraud and conspiracy to commit bank fraud. He complained of misjoinder. The First Circuit rejected the claim. It pointed out that one Burdley Jean had devised a scheme to steal money from customer bank accounts using counterfeit checks. He targeted several banks, recruiting bank insiders to provide him with customer account information (such as account numbers, balances, and customer names), which he used to create counterfeit checks. Additionally, he recruited other individuals to act as runners who would cash or deposit these counterfeit checks. The appellant was an account manager at one of the targeted banks recruited by Jean. The First Circuit held that no serious risk existed that the joint trial compromised a specific trial right or prevented the jury from making a reliable judgment about guilt or innocence. Celestin, 612 F.3d at 19.

Even though no two cases are perfectly symmetrical mirror images of one another in all respects, the court is satisfied that the allegations in this case more properly fit the model described in Arruda, Celestin, Kenny and Greenidge rather than the "hub-and-spokes" model described in Kotteakos. The Indictment does not show a lone wolf like Brown in Kotteakos, preying on multiple individuals for essentially one shot deals, but an ongoing scheme with purpose, plan, coordination, and integration through companies like 3 Comm Global, used in connection with ADL, AAA, and the PRHR.[1]  López, Barreto, Falcón and Rivera were properly charged in connection with one master conspiracy encompassing different subsidiary schemes.

---

[1] Contrary to the case here, the schemes described in United States v. Rodríguez-Torres, Criminal No. 07-302 (JAG-BJM)(Docket No. 1999), and United States v. Prestol-Rodríguez, Criminal No. 14-109 (JAG)(Docket No. 359), fit the Kotteakos "hub-and-spokes" model. See, Rodríguez-Torres (52 physicians charged with fraudulently receiving passing results in revalidation examinations of Board of Medical Examiners between 1995 and 2005; they each individually failed the examination and subsequently received a false passing score); and Prestol-Rodríguez (defendant charged with making false statements to Doral

### B. Prejudice of Joinder

Muñiz alleges that severance is required (Docket No. 166 at p. 21).[2] Severance is allowed by Federal Rule of Criminal Procedure 14(a), which states that "[i]f the joinder of offenses or defendants in an indictment ... appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Severance is warranted only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence. See, Celestin, 612 F.3d at 19 (quoting Zafiro v. United States, 506 U.S. 534, 537 (1993)). Demonstrating unfair prejudice sufficient to require severance of coconspirators' trials is a difficult battle for a defendant to win. United States v. Floyd, 740 F.3d 22, 37 (1st Cir. 2014).

Muñiz claims that he is prejudiced by the joinder because of what he characterizes as increased chances of a "guilt by association" finding by the jury in the event of trial (Docket No. 366 at pp. 16-24). He points out that the acts attributed to the other defendants are more horrific, better documented, and larger than those attributed to him. Id. at p. 19. And thus, he complains that the bulk of the evidence the government intends to present at trial against codefendants Hernández and López would overwhelm what he describes as relatively modest evidence that discovery has revealed the government intends to rely on to prove the charges against him. Id. at pp. 23-24.[3]

---

Bank for the purpose of obtaining a mortgage loan in January 2008; that other defendants engaged in the same conduct through the same group of intermediaries did not justify joinder).

[2] The court assumes that insofar as López, Barreto, Falcón and Rivera joined Muñiz' motion, their claims of prejudice mirror Muñiz'.

[3] In light of Hernández' recent entering of a guilty plea, Muñiz' argument is partially moot and the court limits it accordingly to the possible effects of having a joint trial with López (Docket No. 185).

The claim does not clear the high hurdle set in the caselaw. See, United States v. DeCologero, 530 F.3d 36, 55 (1st Cir. 2008) (finding that "disparity between the relative culpability of co-defendants does not entitle a defendant to severance"), and Arruda, 715 F.2d at 679, where the First Circuit stated that "[b]oth Arruda and Ringland complain that their trial was unfair because they were convicted as a result of 'guilt by association,' rather than on the basis of independent evidence relating to their individual involvement. Arruda further argues that he was on the periphery of the conspiracy and therefore should not have been tried along with coconspirators whose guilt was established by overwhelming evidence. Resolution of this issue is governed by United States v. Smolar, 557 F.2d 13 (1st Cir. 1977), cert. denied, 434 U.S. 971 (1977), in which we held that allegations identical to those raised by defendants here 'are insufficient, either separately or in combination, to render denial of severance an abuse of discretion." Id.

Moreover, the type of potential prejudice asserted in this case can be curbed by specific instructions for jurors to consider the evidence separately as to each defendant. See, United States v. O'Bryant, 998 F.2d 21, 26 (1st Cir. 1993) (noting, in upholding the denial of motion to sever, that the district "court repeatedly gave limiting instructions, cabining the way in which certain pieces of evidence could be used and reminding the jurors that the evidence must be weighed separately as to each defendant on each count of the indictment"); United States v. Boylan, 898 F.2d 230, 246 (1st Cir. 1990) (finding that "the trial judge took effective measures to prevent any significant spillover from materializing. There were appropriate limiting instructions as to the admissibility of evidence against particular defendants and as to the need to determine guilt on an individual basis"); United States v. Natanel, 938 F.2d 302, 308 (1st Cir. 1991) (stating "that the court below minimized any possible prejudice by repeatedly instructing the jury to treat the defendants as individuals and to consider each charge separately. We have consistently derived

comfort from the presence of such prophylactic measures when [dealing with appeals from severance denials]").[4] Combined with a proper trial organization and carefully crafted instructions, there is insufficient room to justify a severance. Defendants are not routinely granted separate trials because they feel it might improve their odds of acquittal. United States v. Houle, 237 F.3d 71, 76 (1st Cir. 2001).

### C. Speedy Trial

Muñiz invokes his constitutional right to a speedy trial under the Sixth Amendment (Docket No. 166 at pp. 2-3, 24-26).[5] The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. In Barker v. Wingo, 407 U.S. 514 (1972), the Supreme Court formulated a four-part inquiry to determine whether a particular delay violates a defendant's constitutional right to a speedy trial. Id. at 530-532. Courts applying the Barker test must balance the following factors: (1) the length of the delay; (2) the reason for the delay; (3) defendant's assertion of his right; and (4) prejudice to the defendant. Id.

As the Supreme Court recognized in Doggett v. United States, 505 U.S. 647, 652 (1992), the first of these is actually a double enquiry. To trigger a speedy trial analysis, the accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from presumptively prejudicial delay, since by definition, he cannot complain that the government has denied him a speedy trial if it has, in fact, prosecuted the case with customary promptness. Id.

---

[4] In Kotteakos, the Supreme Court explained that the danger of prejudice increases along with the number of conspiracies and individuals that make up a wrongly charged single conspiracy. The Court distinguished the conspiracy in that case, which involved eight different conspiracies encompassing between thirteen and thirty-two individuals and did prejudice the defendants, from the case of Berger v. United States, 295 U.S. 78 (1935), where two conspiracies involving four individuals were proved and did not prejudice the defendant. Id. at 766. This case is more similar to Berger, as even by defendants' account there are three conspiracies here.

[5] The court assumes that in joining Muñiz' motion, López, Barreto, Falcón and Rivera intended to raise a similar claim.

at 652. If the accused makes this showing, the court must then consider, as one factor among several, the extent to which the delay stretches beyond the minimum needed to trigger judicial examination of the claim. Id.

The length of the delay is measured from the date of the arrest or Indictment, whichever is earlier, until the start of the trial. "Delay of around one year is considered presumptively prejudicial." United States v. Carpenter, 781 F.3d 599, 610 (1st Cir. 2015). No such period has elapsed in this case. But even if it had, the remaining factors do not show speedy trial violations. Delay to gain advantage weighs heavily against the government, while a more neutral reason such as negligence is weighed less heavily. Barker, 407 U.S. at 531. In the case at bar, the time elapsed cannot be properly attributed to bad faith. See, United States v. Margheim, 770 F.3d 1312, 1327 (10th Cir. 2014) (rejecting constitutional speedy trial claim in part because delay could not be attributed to prosecutorial bad faith).

Defendant has asserted his constitutional speedy-trial right. Although that right is analytically different than the statutory right to a speedy trial regulated by the Speedy Trial Act ("STA"), it is worth noting that the STA has not been violated. The STA was enacted to effectuate the Sixth Amendment right to a speedy trial in criminal prosecutions. United States v. Franklin, 630 F.3d 53, 57 (1st Cir. 2011). It provides that in cases where a plea of not guilty is entered, the trial of that particular defendant "shall commence within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs." 18 U.S.C. § 3161. Several enumerated events are excluded from the statute's prescribed seventy-day period, thus tolling the speedy-trial clock. Margheim, 770 F.3d at 1318.

Muñiz made his initial appearance on December 3, 2015 (Docket No. 25). He was subsequently granted bail (Docket No. 62). On December 8, 2015, the government filed a motion to stay and for *de novo* review of the Magistrate Judge's release Order (Docket No. 56), which Muñiz opposed (Docket No. 59). On December 14, 2015, the government's motion was granted, at which time the court ordered that Muñiz be detained without bail pending trial (Docket No. 91). The timeframe between the government's filing of the motion, and its resolution (i.e. from December 8 to December 14, 2015) is excluded for STA purposes.

On December 14, 2015, the court issued a Scheduling Order, granting defendants until April 15, 2016 to file any motions for change of plea (Docket No. 93 at ¶ 5). That period was also tolled. In addition, on February 5, 2016, the motion *sub judice* was filed (Docket No. 166), the government opposed (Docket No. 188), and Muñiz replied (Docket No. 193). This had the effect of tolling the Speedy Trial Clock. See, United States v. Maxwell, 351 F.3d 35 (1st Cir. 2003) (holding that the entire period during which defendant's motion to sever her trial from that of codefendants was pending was excludable under Speedy Trial Act). The STA has been complied with. Because Muñiz was joined as a defendant with nine other codefendants, any exclusion applicable to him applies to them. United States v. Claxton, 766 F.3d 280, 292 (3d Cir. 2014); United States v. Mallett, 751 F.3d 907, 911 (8th Cir. 2014).

Finally, prejudice should be assessed in light of three interests: (1) to prevent oppressive pretrial incarceration; (2) to minimize anxiety and concern of the accused; and (3) to limit the possibility that the defense will be impaired. Barker, 407 U.S. at 532. The interest given the most weight is the third, which implicates the fairness of the entire system. Id. It is not clear that Muñiz "has alleged any special harm suffered which distinguishes his case from that of any other arrestee awaiting trial." See, Margheim, 770 F.3d at 1330 (so stating in rejecting speedy trial claim under

the Sixth Amendment). He is detained without bail pending trial, but the court in its discretion granted his request to stay in Puerto Rico to facilitate his defense. Meanwhile, López, Barreto, Falcón and Rivera are on bail. And no particularized argument has been put forward that their defense has been impaired. None of the defendants' speedy trial rights have been violated. The Barker factors weigh against them.

### III.   CONCLUSION

Having carefully considered Muñiz' arguments, joinder is appropriate. Severance is not warranted. "'[T]here is a preference in the federal system for joint trials of defendants who are indicted together' because 'they promote efficiency and serve the interests of justice by avoiding [. . . ] the inequity of inconsistent verdicts.'" Celestin, 612 F.3d at 19 (quoting, Zafiro, 506 U.S. at 537). This rule has special force in conspiracy cases, in which the severance of coconspirators' trials "will rarely, if ever, be required." Floyd, 740 F.3d at 36 (quoting, United States v. Flores-Rivera, 56 F.3d 319, 325 (1st Cir. 1995)). Therefore, Muñiz' "Motion to Dismiss the Indictment as to Defendant Javier Muñiz-Álvarez or, alternatively, for Severance of the Appearing Defendant from his Codefendants and Scheduling of Prompt Trial Date" (Docket No. 166) is DENIED as to him, as well as to López, Barreto, Falcón and Rivera.

**SO ORDERED.**

In San Juan, Puerto Rico, this 21st day of April, 2016.

                                                  s/Pedro A. Delgado-Hernández
                                                  PEDRO A. DELGADO-HERNÁNDEZ
                                                  United States District Judge